## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION


**ALAN JAY WILSON,**

      **Plaintiff,**

**vs.**                            **Case No. 4:11cv307-SPM/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

      This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D).  It is recommended that the decision of the Commissioner be reversed and remanded.

**Procedural status of the case**

      Plaintiff, Alan Jay Wilson, applied for disability insurance benefits.  His last date of insured status for disability benefits was December 31, 2011.  Plaintiff alleges disability due to obesity, gout, degenerative lumbar disc disease, and degenerative joint disease of the knee, post surgical correction, with onset on July 1, 2006.  Plaintiff was

50 years of age at the time of the ALJ's decision, has two years of college, and has past relevant work as an ROTC instructor in a high school and as a sergeant first class in the United States Army, serving for over 20 years as an airborne ranger with over 400 jumps.  The Administrative Law Judge found that Plaintiff had the residual functional capacity to do a limited range of light work, can still perform his past relevant work as a school teacher, and thus was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).[1]

---

[1] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant

---

determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[2]

Plaintiff was in the Army from 1979 to 2001, attaining the rank of Sergeant First Class.  R. 51.  He was a certified military diver and a paratrooper.  R. 50-51.  Plaintiff testified that he drives a pickup truck with an automatic transmission.  R. 52.  He drives four to five times a week, depending on how he is feeling.  R. 53.  He drives his 16 year old son to school and drives with his son to his 50 acre pasture where he has 15 head of cattle and three horses.  R. 53-54.  Plaintiff was driven to the hearing by his wife.  R. 55.  He said that normally has his wife drove him from Perry, Florida, to Tallahassee, to see his physician.  *Id.*

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS' DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx, or PUBMED HEALTH, found at http://www.ncbi.nlm.nih.gov/pubmedhealth/, or EVERYDAYHEALTH, found at http://www.everydayhealth.com/drugs.  Information about medical terms and prescription drugs come from MEDLINE PLUS (MERRIAM-WEBSTER), found at: www.nlm.nih.gov/medlineplus/mplusdictionary.htm or NATIONAL INSTITUTES OF HEALTH, found at: http://health.nih.gov.  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.   The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

Plaintiff said that his last work was a high school ROTC instructor.  R. 58. Plaintiff said he was on his feet all day in that job, 95% of the time.  *Id*.  He accompanied students on marches and obstacle courses.  R. 107.  He said that in September during class, he was instructing "raider competition," with students running an obstacle course, and his knee went out as he ran.  R. 58.  He had surgery on his knee in September, 2005.  R. 59.  He went back to work in the spring of 2006, and worked until June, 2006.  *Id*.  He had not held a job since then.  *Id*.  He did not think he was physically able to be an ROTC instructor.  R. 61.  Plaintiff said he was then receiving a combat-related disability pension from the Veteran's Administration with a total disability rating of 70%.  R. 62.

Plaintiff testified that he visits his pasture or ranch about three times a week.  R. 62.  These are short trips, lasting 10 minutes or so.  R. 89.  He rides with his son or wife, supervising, checking on the health of the animals, and making sure that they are fed.  R. 63.  The animals come to the truck, expecting feed.  *Id*.  He could visually check on the health of the animals.  R. 88.  Sometimes he brings feed which his son or wife bought at a feed store.  R. 64.  He said he had driven to the feed store and had the people put the feed into his truck, but since 2005, he had not delivered the feed to the animals by himself.  R. 65.  His son or hired help fixes things at the ranch.  R. 66.  He said that sometimes a board or something may come down, and he moves it so the animals do not step on the nails, but he does not try to nail it back up.  *Id*.  He sold about 10 to 12 animals in the prior year, and he considered the ranch a hobby.  R. 67.  He gets about $180 per 300 pound calf.  R. 68.

Plaintiff said he could do limited household chores that did not involve stooping or bending.  R. 69.  He said that he could help sort laundry from a seated position, move clothing, and pick up pine cones in the yard with a "grabber."  *Id.*  Plaintiff said that on an average day, he could be productive with activity for a couple of hours at most.  R. 90.  He had not gone to his son's sporting events because of the need to sit and stand at such events.  R. 72.  He said if he were very careful, he could tend to his personal hygiene.  R. 84.  He was taking an online course in management from Dickerson State University.  R. 85.  Over a week, he thought he spent 15 to 20 hours taking the course online.  R. 86.  In the last year, he had once taken his sons to a deer stand so they could hunt while he sat in the truck.  R. 87.

Plaintiff said that he is limited by pain in his back and knees, and said that small amounts of activity aggravated both.  R. 72.  The pain was mostly in his right knee, but there was also pain in his left knee, described as a dull pain.  R. 77-78.  The dull pain was two on a scale of 10, but it could go higher.  R. 78-79.  Plaintiff had had three or four surgeries to his knee, and was told he needed a knee replacement, but he was "just not ready for that."  R. 90-1.

Plaintiff described his lumbar pain as a dull pain also.  R. 82.  As he sat at the hearing, he described the dull pain as level 3, but could go to 4 or 5.  *Id.*  He said that getting up and moving helped relieve the back pain.  *Id.* and R. 99.  He said he had gone to the emergency room for back pain a few weeks earlier and Lortab was prescribed.  R. 83.  He took pain medication prescribed by Dr. Ramel Failma.  R. 72-73.

Plaintiff said that he has dizziness and drowsiness from his medications, and this impaired his ability to concentrate.  R. 91-93.

He said that when he has bad spells of back pain, lasting two or three days, he rested totally off his feet and sought relief from ice and heat.  R. 95.  He said he could walk for 10 to 20 minutes and then would "starting to feel some discomfort" in his knees. R. 97.  He said that sitting in the hearing more than 40 minutes was "pushing it," and it was hard to concentrate due to pain.  R. 98.  He said that his depression "certainly doesn't help any."  R. 76.

**Medical evidence**

On January 16, 2006, Plaintiff had an arthroscopic meniscectomy on his right knee.  R. 295.  Plaintiff attended physical therapy and by February 24, 2006, was able to walk reasonably well, though he had significant quadriceps atrophy and weakness of his right leg.  R. 299.  By March 16, 2006, he was regaining strength gradually, but had some crepitation.  R. 300.  He walked well, his knee was stable, and sensation and motor function in his foot were intact.  *Id.*  His surgeon, Dr. Timothy Lane, said that Plaintiff could return to "light duty" with no climbing, running, or squatting.  *Id.*  On April 21, 2006, his physical therapist said that Plaintiff had "a very physically demanding job" (as a high school ROTC instructor) and needed three to four more weeks of physical therapy.  R. 305.  Continued treatment was to include jogging, intense lateral movements, and strengthening, with a very good prognosis.  *Id.*  He was discharged from physical therapy on May 1, 2006, after working "very hard" at rehabilitation.  R. 306.  He had returned to his work as an ROTC instructor.  *Id.*  He was able to jog and

walk on a treadmill, and was released to return to work with the expectation that he would return to his "PLF," his previous level of functioning.  *Id.*

On May 15, 2006, Plaintiff was examined at the VA hospital.  R. 438.  He said his back and knee pain was worse.  *Id.*  He reported a constant dull pain in his right knee, aggravated by walking and standing, and a progressive increase in low back pain.  *Id.*  He said he could not lift objects weighing over 10 pounds without pain.  *Id.*  Plaintiff reported that he had over 400 paratrooper jumps while in service, and in one of the jumps, injured his knee.  *Id.*  He had knee surgery in 1986 and 1997.  *Id.*  He reported his right knee was unstable.  *Id.*  He said that he was self-employed.  *Id.*  Plaintiff walked with a limping gait but entered the office in no acute distress.  R. 439.  His back had no tenderness and he was able to bend and reach 10 inches from the floor.  *Id.*  An MRI from June, 2001, revealed only minimal disc space narrowing at L5-S1.  *Id.*  Plaintiff did 10 deep knee bends, but said that if he did knee bends all day, his knee would be swollen and he would not be able to work the next day.  *Id.*  Plaintiff said he regularly exercised by walking and doing yard work as long as he could stand the pain in his knees.  R. 441.  He said that in the past year, he had not been depressed or lacked interest in doing things.  R. 442.

On October 9, 2006, Plaintiff was seen for his annual physical by Larissa A. Lim, M.D., about ten months after his right knee surgery.  R. 345-346.  Plaintiff said that he had trouble falling asleep, and that the pain in his right knee was worse than in his left knee and back.  R. 345.  Symptoms were worse after bending over with straining.  *Id.*  Plaintiff told Dr. Lim that he was a cattle farmer in Alachua, Florida, that he was going to

school for a business degree, and that he worked part-time as a truck driver.  *Id*.  He

also told Dr. Lim that he ran eight to 10 miles a week.  *Id*.  He had had a right knee

arthroscopy for a torn ligament in January, 2006.  *Id*.  He had undiminished strength in

his extremities.  *Id*.  Dr. Lim prescribed Ambien,[3] tramadol,[4] Flexeril,[5] diet, and exercise.

R. 346.

On March 5, 2007, Plaintiff returned to Dr. Lim.  R. 339.  He reported that his

insomnia was better with Ambien.  *Id*.  He did not report knee or back pain as a

complaint.  *Id*.  Dr. Lim noted, however, that his "arthralgias" were unchanged, and that

he had hurt his back several weeks earlier.  *Id*.  His medications were continued.  R.

340.

On March 20, 2007, Plaintiff had a negative x-ray of his lumbosacral spine.  R.

513.  It was found that his bones were "well-mineralized," his joints and soft tissues

appeared to be normal, and alignment was normal.  *Id*.

On March 20, 2007, Plaintiff was evaluated by Linda Hauzer, ARNP, and Carrie

Ann Labelle, M.D., for VA disability associated with his spinal problems.  R. 389-401.

The problem noted was mild degenerative disc changes, and disc protrusion at L4-L5.

---

[3] Ambien is used for short term treatment of insomnia.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[4] Tramadol is a narcotic-like pain reliever.  Tramadol is used to treat moderate to severe pain.  Tramadol extended-release is used to treat moderate to severe chronic pain when treatment is needed around the clock.  Tramadol is a generic name sold as Ultram.   EVERYDAYHEALTH.

[5] Flexeril is a muscle relaxant prescribed to relieve muscle spasms resulting from injuries such as sprains, strains, or pulls.  Combined with rest and physical therapy, Flexeril provides relief of muscular stiffness and pain.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

R. 389-390.  Plaintiff reported that his lower back had become progressively worse in the prior 20 years, and sometimes there was pain radiating down both legs, and that he did not do much anymore.  R. 390.  It was noted that back surgery had been recommended, but Plaintiff had put that "on hold."  *Id.*  Plaintiff said he had severe flare-ups of back pain weekly, depending upon what activities he had done, and he said that the flare-ups would last two to four weeks.  R. 391.  He said that he could do nothing during a flare-up except bed rest.  *Id.*  Plaintiff reported that he could walk only 100 yards.  R. 392.  From the MRI dated June 2, 2003, it was noted that Plaintiff had "mild degenerative changes with a small broad based right foramen disc protrusion at L4-L5, which is displacing but not compressing the exiting right L4 nerve root."  R. 400-401.  The diagnosis was the same, with radiculopathy down both legs from L4-L5.  R. 401.  Plaintiff said that his condition had severe effects upon his ability to do chores, shop, exercise, and engage in sports, recreation, and travel.  *Id.*

On June 20, 2007, Plaintiff was seen again at the VA clinic by Angel L. Quinones-Colon, RN.  R. 417.  He complained of pain in his back and knee.  *Id.*  He walked with a limp but with an erect posture, in no acute distress.  *Id.*  He had no lower back tenderness, and he could bend over to 10 inches from the floor.  *Id.*  A service connected disability rating of 30% was assigned to the right knee and 10% for lower back pain.  R. 418.  He was not depressed.  R. 419.

On July 10, 2007, Plaintiff was seen by Dr. Lim.  R. 341.  He did not report pain in his knee or in his back.  *Id.*  Dr. Lim prescribed a decrease in alcohol intake, diet, and exercise.  R. 342.

On January 11, 2008, Plaintiff was seen again at the VA clinic.  R. 405.  He reported worse back and knee pain due to the weather.  *Id*.  He used NSAID for pain, and used Ultram "only rarely."  *Id*.

On January 17, 2008, Plaintiff was examined on a consultative basis by Abdul Sofi, M.D.  R. 559.  Plaintiff said he could not work due to severe low back and right knee pain.  *Id*.  On examination, Dr. Sofi found that Plaintiff had tenderness and painful movements of his right knee, that he could not extend the knee properly, and there was some deformity.  R. 560.  Dr. Sofi also seems to have found cyanosis, edema, or clubbing, but this is probably incorrect as Dr. Sofi did not pick which one.[6]  *Id*.  Dr. Sofi also found that Plaintiff had "grade 5 power [full strength] in both lower extremities, hip, knee and ankle joints, although he cannot move the right knee because of pain."  *Id*.  Dr. Sofi had x-rays dated January 17, 2008.  R. 558, 561.  The knee x-ray showed cruciate ligament repair and mild hypertrophic spurring.  R. 561.  The lumbar spine showed only minimal hypertrophic spurring, with no other abnormalities.  *Id*.  Dr. Sofi then said that Plaintiff had:

> severe chronic pain of the back and right knee, causing him not to be able to work.  The patient has some deformity as well as painful movements of the right knee, which may[]be hindering him in doing much work at this time.  The patient may need further evaluation, if not already done by an orthopedic physician for determining the severity of his injury as well as disease.

R. 560.  Dr. Sofi apparently had none of the previous medical records to review.

------------------------------------------------------------

[6] Edema is swelling.  Cyanosis is bluish discoloration due to lack of oxygen. Clubbing is a bulbous enlargement.  The words do not mean the same thing, and the sentence uses "or," indicating that Dr. Sofi probably meant to write "no edema, cyanosis, or clubbing."

On March 25, 2008, Plaintiff was first treated by Dr. Failma.  R. 661.  He sought treatment for congestion and a cough.  *Id.*  He also mentioned chronic low back and knee problems.  *Id.*

On March 28, 2008, Plaintiff returned to Dr. Failma, who noted "suspicions of gout."  R. 660.  He was treating his toe pain with NSAIDs (nonsteroidal anti-inflammatory drugs).  *Id.*

On April 7, 2008, the VA increased Plaintiff's combat related disability benefits to 40% for his spine impairment.  R. 575.  He continued to receive 30% for his right knee and 10% for his left knee.  *Id.*  His total disability rating was 70%.  *Id.*

On April 8, 2008, Plaintiff again saw Dr. Failma for left foot pain.  R. 657.  Plaintiff said he felt "almost resolved from pain" that day, and he was found to be "definitely not as tender with range of motion testing."  *Id.*

On June 4, 2008, Plaintiff was again seen at the VA clinic for disability related to his spine, which he said was a little worse.  R. 518.  He reported drowsiness from tramadol.  R. 519.  Plaintiff reported a constant moderate dull ache in his middle low back, with pain radiating down both legs.  R. 520.  He said he had severe flare-ups every 5 to 6 months, with a duration of more than a month when he had to be confined to a bed.  *Id.*  The flare-ups were caused by bending, lifting, pushing, and pulling.  *Id.*  He said he was able to walk one block.  *Id.*  His gait was antalgic.  R. 522.  Dr. Marc A. Linden, an examining physician at the VA, said that Plaintiff's low back condition "should not preclude very light duty or sedentary employment."  R. 530.  Dr. Linden thought that

Plaintiff would be limited to less than 20 minutes per hour lifting or carrying less than 20 pounds occasionally, with minimal bending, and a sit or stand option was preferable. *Id.*

On July 2, 2008, Plaintiff was seen by Dr. Failma. R. 656. He complained of chronic joint pain in his hips, knees, and low back, keeping him up at night. *Id.* Plaintiff said he previously had good relief with tramadol (Ultram), but it had stopped working. *Id.* On examination, some lumbar tenderness (without radiculopathy) was noted, and nonspecific right knee pain was also noted. *Id.* Ultracet[7] was prescribed. *Id.*

On October 20, 2008, Plaintiff was seen by Dr. Failma. R. 652. Plaintiff was suffering from gout in his left foot and he took medication for that condition. *Id.* Plaintiff also thought that the pain and instability of his right knee were becoming worse. *Id.* On examination, Plaintiff had "some discomfort on valgus stress, more than varus stress," of his right knee. *Id.* Plaintiff told Dr. Failma that a right knee replacement had been recommended, and Dr. Failma decided an MRI was needed. *Id.*

On November 5, 2008, an MRI of Plaintiff's right knee revealed tricompartmental degenerative changes, and a medial and lateral meniscal tear. R. 623. The ACL repair seemed to be intact. *Id.*

On November 6, 2008, Plaintiff returned to the VA and was examined by Anne Hastings, ARNP. R. 587, 593. The purpose was to determine the current level of disability due to Plaintiff's right knee problems. R. 587. The claims file was then at the

---

[7] Ultracet is a trademark for a preparation of tramadol hydrochloride and acetaminophen. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS. Ultracet is used to treat moderate to severe pain for a period of five days or less. It contains two pain-relieving agents. Tramadol, known technically as an opioid analgesic, is a narcotic pain reliever. Acetaminophen is the active ingredient in the over-the-counter pain remedy Tylenol. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

Board of Veterans Appeals.  *Id.*  Nurse Hastings noted that a VA examination on June 4, 2008, did not note any instability of the knee.  *Id.*  Hastings further said that an outside orthopedist determined on October 11, 2005:  "Stability examination reveals NORMAL STABILITY [o]n anterior/posterior and varus/valgus stress testing."  R. 588 (emphasis in original).  It was noted that an examination on November 20, 2004, found that Plaintiff "is STABLE TO VARUS VALGUS stress," but said that "patient is significantly disabled both functionally and SUBJECTIVELY by his knee."  *Id.* (emphasis in original).  Hastings explained to Plaintiff that there was a difference between his subjective feeling of "giving way" and the "medical-objective findings on various knee maneuvers to test for instability."  R. 589.  She said that the "usefulness of tests is limited if the patient's muscles are not relaxed, as quadriceps contraction masks signs of instability."  *Id.*  She later again said that a 2004 examination diagnosis discussed Plaintiff's subjective feelings that his right knee was unstable, but examination findings in 2004, 2005, and 2008 "all show negative valgus/varus."  R. 593.  She said that Plaintiff could stand for 15 to 30 minutes but was unable to walk for more than a few yards.  R. 590.

On December 16, 2008, the VA Board of Veteran's Appeals found that Plaintiff was entitled to a 60% disability rating for his spinal problems.  R. 255.  The Board followed the guidance of 38 C.F.R. § 4.3, which provides that if a reasonable doubt arises regarding the degree of disability, such doubt will be resolved in favor of the veteran.  R. 256.

On February 6, 2009, Plaintiff was seen in the Tallahassee Orthopedic Clinic by Garrison A. Rolle, M.D.  R. 620.  Plaintiff complained of a constant dull ache in his right knee.  *Id.*  He reported that he worked "as an entrepreneur working cows."  *Id.*  Examination of Plaintiff's right knee revealed minimal medial and lateral patella facet and joint tenderness.  *Id.*  Dr. Rolle found Plaintiff's knee to be stable "to varus and valgus stress."  *Id.*  A pivot shift test was impossible to perform because Plaintiff was "jumpy and very apprehensive."  *Id.*  Dr. Rolle reviewed an x-ray, noting a possible tear of the lateral meniscus, and the absence of the medical meniscus consistent with the surgery, and "significant chondromalacia[8] in both the medial and lateral compartments."[9]  *Id.*  Dr. Rolle diagnosed probable insufficient ACL, probable meniscus tear, and chondromalacia.  *Id.*  He recommended diagnostic arthroscopy, but "because of his work schedule and season, [Plaintiff] chose to undergo an injection."  *Id.*  Plaintiff was to rest for a couple of days and "then resume normal activities."  *Id.*

On April 9, 2009, Dr. Failma filled out a "multiple impairment questionnaire."  R. 627-634.  His diagnosis was chronic joint pain, lumbar degenerative disc disease, and lower extremity neuropathy, with "recovery unlikely" as his prognosis.  R. 627.  He said that his diagnosis was supported by MRI findings, range of motion testing of Plaintiff's back, legs, knees, and hands, and his antalgic gait.  *Id.*  Specifically, he cited knee MRIs in November, 2008, and October, 2005, a lumbar MRI in June, 2003, and a left foot MRI

---

[8] Chondromalacia is the abnormal softening of cartilage.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[9] Dr. Rolle also noted that x-rays of both knees showed no obvious wear, and only minimal changes in the right knee as compared with the left.  R. 622.

in December, 2008.  R. 628.  He said that Plaintiff's primary symptoms were chronic lower back and knee pain, radicular symptoms, possible depressive symptoms, decreased tolerance for activity, and decreased range of motion.  *Id*.  He said that Plaintiff's pain was daily, and easily exacerbated by movement, or prolonged standing or sitting.  R. 629.  He found Plaintiff to be easily irritable.  *Id*.  He said that Plaintiff had pain and fatigue ranging from 3 to 10, and that the pain had not been relieved with medication without unacceptable side effects.  *Id*.  He thought that Plaintiff could sit or stand at most for one hour a day, and could not, for medical reasons, sit or stand continuously in a work setting.  R. 629-630.  He said that Plaintiff had to get up and move every 30 to 60 minutes before returning to sitting.  *Id*.  He thought that Plaintiff could only occasionally lift and carry up to 10 pounds, and had significant limitations for doing repetitive reaching, handling, fingering, or lifting.  R. 630.  Dr. Failma said that "PT" (physical therapy) had not resulted in improvement.  R. 631.  He said that Plaintiff's symptoms would increase in a competitive work environment and his condition would interfere with his ability to keep his neck in a constant position looking at a computer screen.  *Id*.  He thought that Plaintiff could not do a full time competitive job requiring activity on a sustained basis, and that his pain and fatigue frequently to constantly interfered with his ability to attend and concentrate.  R. 632.  He thought that Plaintiff was incapable of tolerating even low stress.  *Id*.  He thought that Plaintiff would be absent from work more than three times per month.  R. 633.

**Legal analysis**

### Whether the ALJ improperly discounted the opinions Dr. Failma and Dr. Linden, treating physicians

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Winschel v. Commissioner of Social Sec., 631 F.3d 1176, 1179 (11th Cir. 2011).  The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).  This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Winschel, 631 F.3d at 1179; Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

The Administrative Law Judge described much of the medical and testimonial evidence in his opinion.  R. 28-31.  In particular, he noted that in May, 2006, after the last surgery to his right knee and completion of physical therapy, it was reported that while Plaintiff had minor limitation in right knee range of motion and strength, Plaintiff was able to jog and walk on a treadmill, had returned to work, and his therapist said he had returned to his level of functioning prior to his injury.  R. 29.  The ALJ noted that in October, 2006, Plaintiff told Dr. Lim that his sleep was being interrupted by knee pain, but despite his complaints, he told her that he ran eight to ten miles a week, worked as a part-time truck driver, and she did not note any significant abnormalities in her examination.  *Id.*

The ALJ further noted that despite Plaintiff's subjective complaints of knee and back pain to the VA, objective testing was not supportive.  R. 29.  The ALJ observed that "[i]maging showed only mild degenerative changes with protrusion at the L4-5 level with no neurological impairment."  *Id.*  He also found that Dr. Linden said, after examination, that his findings were not severe enough to account for Plaintiff's abnormal gait and no radicular symptoms were elicited.  *Id.*  The ALJ further noted that Dr. Linden concluded that Plaintiff was limited to light or sedentary work with limitations on his ability to sit, stand, or bend based on Plaintiff's subjective complaints, but the ALJ also found that the subjective complaints "exceeded the objective findings."  R. 29-30.

The ALJ then reviewed the consultative physical examination by Dr. Sofi.  R. 30. He did not mention Dr. Sofi's comment about inability to work due to knee and back pain, but the ALJ did note that Dr. Sofi found that Plaintiff had full strength in his lower

extremities, that the x-rays that Dr. Sofi had showed only minimal problems in the right

knee and lumbar spine, and that Dr. Sofi would defer to the opinion of an orthopedic

surgeon in regards to the limitations caused by Plaintiff's right knee problems.  *Id.*

The ALJ reviewed the orthopedic opinion of Dr. Rolle, noting that Plaintiff told Dr.

Rolle that at that time, in February, 2009, he was an entrepreneur working a cattle

ranch.  R. 30.  The ALJ noted that Dr. Rolle found Plaintiff's right knee to be stable with

varus and valgus stress testing, with minimal tenderness.  *Id.*  Dr. Rolle had had trouble

conducting range of motion testing because Plaintiff's apprehension interfered with

testing.  *Id.*  The ALJ further noted that Dr. Rolle recommended arthroscopic revision,

but Plaintiff could not do this "because of his work schedule that season," and instead,

had an analgesic injection.  *Id.*

Turning to the records of Dr. Failma, the ALJ determined that Plaintiff had an

aggravation of painful symptoms that appears to have been adequately resolved with

medication.  R. 30.  He also noted Dr. Failma's treatment of apparent gout in Plaintiff's

left foot.  *Id.*  He then noted Dr. Failma's residual functional capacity opinion which will

be addressed ahead.  R. 30-31.

The ALJ also accurately reported Plaintiff's testimony.  R. 331.  Of relevance

here, he determined that Plaintiff said he drove his truck two to five times a week, drove

his son to and from school three times a week, drove to his cattle ranch to check on the

health of his animals, but did not drive longer distances.  *Id.*  He noted that Plaintiff said

that his wife or son fed the ranch animals, but he did minor pick up of things in the way,

that he fed and watered his dog, and did only light household chores.  *Id.*  He noted

Plaintiff's testimony that he could walk for only two hundred yards without significant pain, and that his back pain was aggravated by sitting. *Id*. He noted that after sitting for an hour at the hearing, his back pain was at level three, and that he could not sit for more than two hours in an eight hour day. R. 32. He also noted Plaintiff's testimony that his pain medications cause drowsiness and impairment of concentration, and that he had aggravation of symptoms about once a month lasting one to three days. *Id*.

The ALJ then said he gave significant weight to the "opinion" of Dr. Sofi and Dr. Rolle, noting especially that Dr. Rolle was an orthopedic surgeon. R. 32. He found that their findings suggested that Plaintiff could do a limited range of light work. *Id*.

Finally, the ALJ discounted the opinion of Dr. Failma. R. 33. He said that his opinion was not supported by his own treatment notes and was not consistent with the objective evidence "throughout the record." *Id*. The ALJ similarly discounted the opinion of Dr. Linden because the opinion seemed to have been based on Plaintiff's subjective complaints, and was not supported by objective findings. *Id*.

Though the paragraph in which the ALJ discounted the opinion of Dr. Failma did not again refer to the evidence, that evidence had already been fully set forth as explained above and is substantial evidence in the record to discount Dr. Failma's residual functional capacity assessment. Dr. Failma's medical treatment records indeed do not contain objective evidence to support his residual functional capacity opinion. He did little in the way of objective testing of Plaintiff's lower back and right knee, and on several occasions, knee and back pain was not the problem treated.

After right knee surgery, Plaintiff was diligent in physical therapy, he healed well, and he was released to light duty.  In 2006, some months after the knee surgery, Plaintiff was running eight to ten miles a day.  Objective testing of right knee stability over the period from 2005 through 2008 was mixed, as the VA pointed out.  In 2008, Dr. Rolle, an orthopedic specialist, found with testing that Plaintiff's knee was stable.  By 2008, Plaintiff's knee pain was apparently becoming worse again, but Plaintiff declined Dr. Rolle's recommendation of further knee surgery because of his work needs and the "season," and he told Dr. Rolle that he worked "as an entrepreneur working cows."

There was like evidence of daily activities inconsistent with Dr. Failma's assessment.  Plaintiff testified that he was taking an online college course, and worked on that 15 to 20 hours a week, presumably in a seated position, which was inconsistent with Dr. Failma's opinion that he could sit or stand only about two hours a day, and inconsistent with Dr. Failma's opinion that Plaintiff had problems with his neck, hands, and arms.  He was able to drive his truck with some frequency each week, similarly inconsistent with Dr. Failma's opinion.  Plaintiff told Dr. Lim in October, 2006, that he was attending school in pursuit of a business degree, worked part-time as a truck driver, and worked as a cattle rancher.  This was additional substantial evidence in the record to support the ALJ's decision to discount Dr. Failma's opinion.  Plaintiff's testimony as to the limitations of his daily activities, of course, was inconsistent with this evidence, but the court's task is to determine whether substantial evidence exists to support the ALJ's conclusions, not to determine the issues *de novo*.

Other objective medical evidence was also inconsistent with Dr. Failma's opinion. X-rays in 2007 did not show significant lumbar abnormalities.  An MRI dated June 2, 2003 revealed only "mild degenerative changes with a small broad based right foramen disc protrusion at L4-L5, which is displacing but not compressing the exiting right L4 nerve root."  R. 400-401.  On June 20, 2007, at a VA examination, Plaintiff had no lower back tenderness, and he still could bend over to ten inches from the floor.  R. 417.  On January 11, 2008, Plaintiff was using NSAID for pain, and used Ultram only rarely, though a few months later, he said Ultram was no longer working and Ultracet was prescribed.

Further, Dr. Linden's opinion was inconsistent with Dr. Failma's opinion, and was not disregarded by the ALJ.[10]  Dr. Linden said that Plaintiff's low back condition "should not preclude very light duty or sedentary employment."  R. 530.  Dr. Linden thought that Plaintiff would be limited to less than 20 minutes per hour lifting or carrying less than 20 pounds occasionally, with minimal bending, and a sit or stand option was preferable.

For all of these reasons, the ALJ's rejection of the opinion of Dr. Failma, and reliance upon the opinion of Dr. Linden, correctly followed the law and is supported by substantial evidence in the record.  However, as will be explained, the ALJ did not explicitly discuss and evaluate the VA disability rating.  A remand is needed for that purpose, and this necessitates reconsideration of Dr. Failma's opinion in light of the VA

---

[10] I agree that the ALJ could not disregard Dr. Linden's opinion because it was premised upon Plaintiff's subjective complaints, but that finding leads to no useful Place as Dr. Linden's residual functional capacity assessment is much the same as the one adopted by the ALJ.

determination.  If the VA rating is given great weight, it will provide significant support for Dr. Failma's assessment.

**Whether the ALJ erred in failing to consider the VA disability decision**

The ALJ did not indicate the weight he gave, if any, to the VA decision that Plaintiff suffers a significant combat-related disability and was awarded VA disability benefits based upon a 70% disability rating.  R. 25-33.  Plaintiff assigns this as error. Doc. 11, p. 14.

A disability rating by the Veteran's Administration is not binding upon the Commissioner but is entitled to great weight.  Brady v. Heckler, 724 F.2d 914, 921 (11th Cir. 1984); DePaepe v. Richardson, 464 F.2d 92, 101 (5th Cir. 1972).  The VA disability rating here was 70%.  While it does not bind the Commission, this high disability rating should have been more closely examined by the ALJ.  Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th Cir. 1981) ("A VA rating of 100% disability should have been more closely scrutinized by the ALJ.").

Defendant argues that the VA rating was based upon Dr. Linden's review, and since the ALJ partially discounted Dr. Linden's opinion, "it can be inferred that he indirectly discounted the disability rating from the VA based on his evaluation of Dr. Linden's opinion."  Doc. 14, p. 9.  The portion of Dr. Linden's opinion that was "discounted" because based upon Plaintiff's "subjective complaints" appears to be the portion that found that Plaintiff had significant limitations of his ability to sit, stand, or bend.  R. 30.  Still, Dr. Linden found that Plaintiff could do light or sedentary activities, consistent with the residual functional capacity determined by the ALJ, so the

importance of this "discounting" is rather unclear.  In any event, this short analysis of Dr.

Linden's opinion is not an adequate substitute for "close scrutiny" of the VA disability

rating itself.  A remand is needed for that purpose.  Since this evidence was not

considered when discounting Dr. Failma's opinion, it is also necessary to reconsider Dr.

Failma's opinion in light of whatever weight is assigned to the VA disability rating.

### Whether the ALJ properly determined Plaintiff's credibility

The ALJ discounted Plaintiff's testimony, finding that while his medically

determinable impairments could reasonably cause the symptoms, the extent of the

symptoms was not credible.  R. 32.  The ALJ noted that Plaintiff responded well to knee

surgery and therapy, and Plaintiff chose not to have further surgery so that he could

"perform duties on his farm."  *Id.*  The ALJ noted that Plaintiff's description of his back

problems was more severe when presented to the VA than recorded by his treating

physicians.  *Id.*  For the reasons set forth above with respect to the ALJ's analysis of the

opinions of treating physicians, these findings are supported by substantial evidence in

the record and are sufficient to discount Plaintiff's testimony.[11]  However, a remand is

needed to discuss and evaluate the VA rating, and when that has occurred, the ALJ

must again address this issue.  If the VA rating is given great weight, it will provide

significant support for Plaintiff's testimony.

---

[11] "If the ALJ discredits subjective testimony, he must articulate explicit and adequate
reasons for doing so."  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The
reasons articulated by the ALJ for disregarding the claimant's subjective testimony must
be based upon substantial evidence.  Jones v. Department of Health and Human
Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

### Whether the residual functional capacity (RFC) determination is supported by substantial evidence

The ALJ's residual functional capacity assessment is supported by substantial evidence in the record if he properly evaluated the medical opinions and Plaintiff's testimony.  Those aspects of the decision may be altered, however, depending upon the weight to be given to the VA rating.

### Whether Plaintiff's past relevant work was as a school teacher

The ALJ determined that Plaintiff could do his past relevant work as a school teacher, requiring an ability to do light work.  R. 33.  Plaintiff contends that his past relevant work as an ROTC high school instructor was performed at the medium exertional level, and not the light work level of an ordinary school teacher.  Doc. 11, p. 18.  Plaintiff refers to the testimony of the vocational expert, which so found without contradiction.  R. 104, 107-108.  Plaintiff contends that it was error to refer to his past relevant work as an ordinary school teacher.  *Id.*  Plaintiff points out that he does not have a college degree, but has only experience in the Army.  *Id.*  Plaintiff concludes that since he cannot do medium work and is not a certified school teacher in general, the conclusion that he can return to his allegedly past relevant work as a school teacher is flawed.  *Id.*

Plaintiff is correct.  The vocational expert said that an ROTC instructor is typically performed "at least" at the medium exertional level.  R. 104.  The vocational expert admitted that the requirement that such an instructor accompany the cadets on marches and running obstacle courses would require "much heavier exertion" than a normal school teacher.  R. 106-108.  Plaintiff did not have past relevant work as a school

teacher in general, even though he used that phrase in several documents in the record.  A remand is needed to determine at step 5, based upon vocation testimony, whether there are other jobs in the national economy which Plaintiff may do with his limited residual functional capacity.

**Conclusion**

In summary, portions of the ALJ's decision are supported by substantial evidence in the record.  A remand is needed, however, to evaluate the VA disability rating, to reconsider other portions of the opinion in light of the VA disability rating, and to reconsider the claim at step 5.

Therefore, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED**, and the case be **REMANDED** for further consideration as set forth in this report and recommendation.

**IN CHAMBERS** at Tallahassee, Florida, on February 15, 2012.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**